## CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

Edward Goodove, etc.

v.

Charles E. Dye,
Charles E. Brown, Jr., et al.

Case No. (Law) 4552

By JUDGE JAY T. SWETT

April 19, 1991

The following are my findings and rulings as a result of the pre-trial conference held on April 17, 1991. Before I discuss those matters, let me confirm the preliminary matters taken at the beginning of the pre-trial conference. First, in the case of *Goodove v. Dye, et al.*, Law No. 4552, the Cross-Claim of co-defendant Brown against co-defendant Dye was dismissed by nonsuit. Following that, the companion action, *Dye v. Brown*, Law No. 4664, was dismissed by nonsuit. Second, the plaintiff abandoned his claim for punitive damages. Finally, the Court noted that Mr. Lloyd Snook entered an appearance on behalf of co-defendant Dye.

Certain of the matters to be considered at the pre-trial conference were resolved by agreement. The parties agreed that there would be no reference or testimony regarding consumption of alcohol by any of the occupants of the two vehicles. It was agreed that there would be

no reference to the occupants of either vehicle having been to a party before the accident. Any reference made by a witness or an attorney to a "party" would refer to an event held at a "friend's apartment." The parties agreed to a question to be read by the Court during jury *voir dire* regarding the use of alcohol. That instruction will be given by the Court at the conclusion of its normal *voir dire*. The parties stipulated that the cause of death of the plaintiff's decedent was due to injuries received in the accident which is the subject matter of the case. The parties stipulated to the authenticity of the decedent's University of Virginia's transcript and to medical and funeral bills incurred by the plaintiffs: There was no agreement as to the authenticity or admissibility of a diagram prepared by Mr. Bewkes. However, the parties agreed that reference could be made to his diagram during opening statements for the purpose of educating the jury as to the general scene of the accident. Finally, the parties agreed to the reading of the deposition of Elizabeth Hughes during the trial.

Most of the matters in dispute concern the testimony of various witnesses regarding the speed of the Brown vehicle. Before the matter was argued, Mr. Albro, on behalf of the plaintiff, indicated that he would not present testimony regarding the speed of the Brown vehicle from either Officer Grissom or Sgt. Roberts or his expert witness, Mr. Bewkes. Therefore, the Motion in Limine focused on expected testimony regarding speed of the Brown vehicle from Mr. Goetz Rokahr and Mr. Blackburn. Rokahr was a passenger in the Dye vehicle. Blackburn is an expert witness who will be called by co-defendant Dye.

Preliminarily, it is important to note that the admissibility of evidence with regard to an opinion of the speed of a vehicle is normally resolved during trial. Such testimony is based on an appropriate foundation laid by the witness prior to responding to a question that elicits either a lay or an expert opinion on speed. As will be seen, this principle will affect my rulings both as to Rokahr and Blackburn.

The parties agree that one may give a lay opinion as to the speed of a vehicle provided that some foundation has been shown that the witness was in an opportunity to observe the vehicle and to arrive at a reasonable

estimate of speed. It is fair to conclude that the amount of evidence necessary to establish that foundation is not very much. As was noted in *Moore v. Lewis*, 201 Va. 522 (1960), the "brevity of the observation" would not affect the admissibility of the evidence, but rather the weight to be given to the testimony by the jury. Here, it is offered that Rokahr, a passenger in the Dye vehicle, will say that his estimate of the Brown vehicle, as observed prior to the accident, was either "extremely fast" or "over 25 miles per hour." In addition, Rokahr is expected to testify that he saw the Brown vehicle for "a split second." As to Rokahr's testimony regarding speed based on his observation prior to or at the time of the accident, this testimony will be admitted under *Moore v. Lewis*. Its weight will be left to the jury.

With regard to Rokahr's testimony as to what he did after the accident, it is my understanding that Rokahr may testify that he returned to the accident scene, attempted to measure the distance between where he thought he saw the headlights of an oncoming unidentified car and where he saw the Brown vehicle prior to the accident. It is also my understanding that he will testify that he attempted to recreate the movement of the Dye vehicle and, using a stop watch, come up with an estimate of the time between when he first saw the oncoming headlights and when he saw the Brown vehicle. It seems to me that this testimony rests upon whether a proper foundation can be made by Mr. Rokahr both with regard to the points establishing the estimated distance traveled by the Brown vehicle and the conditions under which he simulated the operating of Dye vehicle. If the appropriate foundation is laid, Rokahr's testimony should be admitted. If the testimony is admissible, the Court sees no reason why he should not be able to perform a simple mathematical computation by dividing his estimate of distance by his estimate of time to arrive at speed.

The admissibility of the testimony of Blackburn also involves issues regarding proper foundation. It now appears that "accident reconstruction" testimony is an appropriate subject for expert witnesses in Virginia. In *Grasty v. Turner*, 206 Va. 723 (1966), the Court refused to permit an expert to testify regarding the speed of a vehicle where the only basis for the opinion was the physical

damage to the vehicle caused by the impact. The Court went on to say that if the expert could give an opinion of speed based on solely the damage to the vehicles, the expert in *Grasty* made improper assumptions in arriving at his opinion. These assumptions, particularly with regard to the weight and the condition of the car before the accident, were important to the expert. Since he conceded that the actual information of weight and vehicle condition could have affected his opinion, then it was found that he failed to consider all of the necessary variables in arriving at his particular opinion.

The expert opinion on speed rejected in *Thorpe v.Commonwealth*, 223 Va. 609 (1982), was rejected for somewhat different reasons than the opinion in *Grasty*. The basis for the expert opinion in *Thorpe* was in part based upon a test made with a police vehicle after the accident to determine the "drag coefficient" of the road surface. The purpose of the test was to determine the minimum speed at which the defendant's truck would sideslip which the evidence showed had occurred. The Supreme Court rejected the expert testimony on the ground that the record did not contain sufficient evidence to show that the tests conducted by the expert using a police officer's vehicle were performed under conditions substantially similar to those that existed at the time of the accident. 223 Va. at 613. Since the proper foundation had not been laid and considering the fact that the test was run two months after the accident, the Court rejected the foundation for the expert's testimony and ruled the opinion inadmissible.

In *Swiney v. Overby*, 237 Va. 231 (1989), the Supreme Court did not permit an expert to testify as to stopping distance because the expert was not able to lay a proper foundation. His opinion was not based on a consideration of all of the variables which were part of his opinion, particularly regarding the condition of the brakes of the vehicle. The Court referred to this omission as a "missing variable" which precluded the admissibility of the expert opinion.

The recent case of *Hubbart v. Commonwealth*, decided by the Court of Appeals reaffirms these general principles. In *Hubbart*, the expert laid a proper foundation by including

in his testimony all of the matters which he had considered important and which formed the basis of his opinion.

Applying the principles of these cases to the objections to Blackburn's testimony, I make the following rulings.

I find no basis that Mr. Blackburn's testimony should be excluded because he is unable to explain the derivation of a formula which he apparently has utilized in forming his opinion. While arguably his ability to explain the formula might enhance the weight of his opinion, his inability to do so does not render his opinion inadmissible. It would only go to its weight. The fact that the formula is based upon data compiled from thousands of other accidents does not alone exclude the expert from giving his opinion. It would depend on whether the data compiled by the government makes assumptions about important variables which are necessary to form the basis of his opinion. If the formula is based on information that would vary depending on the particular vehicle involved or on other conditions related to this accident, then utilizing general data to make general assumptions may well preclude the expert from testifying. This was the holding in *Grasty v. Tanner*. On the other hand, if Blackburn's opinion would be the same whether he used general data or the specific data regarding these two vehicles, then there is no issue regarding missing variables. To the extent that Blackburn's opinion is based on tests conducted after the accident, the question depends on whether the tests were done under the same or substantially similar conditions that existed at the time of the accident. This can only be determined after hearing Blackburn's testimony.

The next issue is the testimony of Mr. Bewkes, the expert to be called by the plaintiff. To the extent that Mr. Bewkes will testify and/or introduce photographs to recreate the path of one or both vehicles at the time of the accident for the purpose of rendering an opinion as to line of sight, stopping distance or similar matters, the admissibility of the opinion then will rest on whether the proper foundation has been made.

The admissibility of the evidence will depend on whether Bewkes's tests were done under the same or substantially similar circumstances that existed at the time of the accident. The fact that Mr. Bewkes may have conducted

his tests based in part upon hearsay facts and/or data does not, in and of itself, preclude him from giving an opinion. § 8.01-401.1. On the other hand, if, as the Court expects, Bewkes's testimony of his tests (or experiments) were conducted under conditions that were not similar to those that existed at the time of the accident, then Bewkes's testimony will not be permitted. Here, it is my understanding that the tests (or experiments) were conducted in the daytime, whereas this accident occurred at night. This factor alone is sufficient to exclude the testimony given the different conditions that exist while driving in the daytime as opposed to driving at night. Thus, to the extent that Mr. Bewkes's testimony and/or photographs are offered to recreate or establish the path of either vehicle, the line of sight or range of visibility of either driver, or the like, this testimony will not be admitted if based on daytime tests or experiments.

One more comment with regard to the photographs. The Court would permit photographs being made available to the jury that generally portray the accident scene. Because this accident occurred at night, as a practical matter daytime photographs are the only ones that can be used. However, many of the photographs are purported to be taken from the driver's seat of a vehicle similar to that driven by Dye. Some of the photographs show oncoming traffic approaching the intersection where the accident occurred. Because it is my conclusion that the daytime photographs cannot be utilized to recreate the scene of the accident from the point of view of the Dye vehicle, I cannot turn around and permit the introduction of the same photographs offered simply to show the general accident scene. Thus, I will permit general photographs of the accident scene even though taken in the daytime, provided they do not include other oncoming traffic or do not purport to depict the view of one driver or the other.

The next matter to consider is the role of counsel for Dye, Brown, and the uninsured motorist carriers. A starting point is a recognition that the Court does have the power to place reasonable restrictions on the role of attorneys who purport to represent the same party. On the other hand, I recognize that there are interests that may be different as between an individual defendant and the uninsured motorist carrier who is at risk for judgment

against an underinsured or uninsured defendant. My decision on the role of counsel is this. The attorneys for the defendants and the insurance companies should endeavor in good faith to allocate their roles with regard to opening statement, examination of witnesses, and closing argument so as to minimize the number of attorneys who speak on behalf of the same defendant. The Court will permit the attorneys for the insurance companies and the defendants to jointly participate in the trial, but only to the extent that they believe that the interests of their clients are not adequately protected by the role of the attorneys for the individual defendants. If, during the course of the trial, the attorneys for the defendants are not exercising restraint in the roles I have defined, then I will modify this ruling and limit the roles of counsel in the fashion requested by Mr. Albro.

The final matter concerns the objection to the testimony of Dr. Blackman. The Court denies the request to exclude that testimony., The Court will give the jury a cautionary instruction, if requested, limiting their consideration of that statement only to Dr. Blackman's treatment of Mr. Goodove.

### June 25, 1991

The defendants have moved for a new trial or, in the alternative, for an order of remittitur. For the reasons stated herein, the defendants' motion for a new trial under § 8.01-383 is denied. Also, for the reasons stated herein, the court grants the defendants' request for remittitur under § 8.01-383.1. More specifically, the court will direct that the plaintiffs remit a portion of their recovery or submit to a new trial on the issue of damages. The amount of the recovery which the plaintiffs are directed to remit is $250,000.00.

My reasons for denying the request for the new trial and for ordering remittitur will be given following a summary of the evidence presented at trial.

This suit arose out of an automobile accident that occurred early on the morning of February 25, 1990, at the intersection of Preston Avenue and Rugby Road in Charlottesville, Virginia. Defendant Charles E. Dye, a student at the University of Virginia, was operating his vehicle

westbound on Preston Avenue. There were several passengers in Dye's vehicle, including Jeffrey H. Goodove. As Dye approached the intersection of Preston Avenue and Rugby Road, another vehicle operated by the defendant, Charles E. Brown, Jr., approached the intersection from the opposite direction. As the two vehicles approached the intersection, Dye commenced a left-hand turn from Preston Avenue on to Rugby Road. The Brown vehicle, travelling eastbound on Preston Avenue, struck the right rear portion of the Dye vehicle in the intersection. Jeffrey H. Goodove, seated in the right rear of the Dye vehicle, was killed.

Edward and Harriet Goodove, parents of Jeffrey H. Goodove, qualified as co-administrators of Jeffrey H. Goodove's estate and filed this wrongful death action against Dye and Brown. Also named as defendants were two insurance companies that provided uninsured or underinsured coverage to the defendants, Government Employees Insurance Co. and United States Fidelity and Guaranty Co. The suit sought $5,000,000.00 in compensatory damages and $1,000.000.00 in punitive damages. Prior to trial the punitive damage claim was withdrawn. The statutory beneficiaries eligible to participate in any verdict rendered for the plaintiff were the decedent's parents and his two brothers, Michael and Scott Goodove.

The case was tried before a jury on April 22, 23, and 24, 1991. The evidence at trial presented jury issues of negligence as to each defendant in the operation of their respective vehicles. While discussing proposed jury instructions, the court denied the defendants' motion that plaintiffs' counsel, during his summation, be prohibited from mentioning to the jury specific amounts as suggested awards for each statutory beneficiary. The motion was denied based on my interpretation of Va. Code § 8.01-379.1 and its application to an action for wrongful death in which the jury is requested to distribute a wrongful death award to the eligible statutory beneficiaries under Va. Code § 8.01-54.

During his summation, the attorney for the plaintiffs requested specific awards of $500,000.00 to each of the four statutory beneficiaries. After approximately two hours of deliberation, the jury returned verdicts in the amount of $200,000.00 for each statutory beneficiary plus hospital and funeral expenses in the amount of $7,120.26.

*Evidence Regarding Damages*

There was no evidence during trial that any beneficiary had been deprived of any compensation or loss of income because of the decedent's death. The instruction regarding the elements of damages which the jury could consider included damages for (1) sorrow, mental anguish, and loss of solace and (2) any reasonably expected loss of services, protection, care, and assistance which the decedent provided to his family.

The evidence at trial disclosed the following. The decedent, Jeffrey Goodove, was the middle of three sons of Edward and Harriet Goodove. He was raised in the Virginia Beach area. He had an outstanding record at Kempsville High School and placed in the top 10% of his class. In high school he decided he wanted to be a doctor and worked hard to take the correct courses and acquire the necessary grades in order to enroll in the University of Virginia in hopes of then going on to medical school.

Jeffrey grew up in a close, tightly-knit, and loving family. He developed a particularly close relationship with his father. There was evidence that his father, a pharmacist, had always aspired to go to medical school and that Jeffrey's interest in medicine was in part the basis for their close relationship. Apparently, Mr. Goodove saw in Jeffrey the potential to do what he had not been able to do.

There was evidence that Jeffrey was close to his brothers. Michael, his older brother by two and one-half years, preceded him to the University of Virginia and had already graduated when the accident occurred. His younger brother, Scott, was still in high school at the time of the accident.

There was substantial evidence presented at trial regarding the impact on the lives of Mr. and Mrs. Goodove resulting from Jeffrey's death. There was testimony that Mr. Goodove was so distraught at the funeral that he threw himself on his son's casket. There was evidence that since Jeffrey's death, Mr. Goodove has become withdrawn and depressed. He has been seen by a psychiatrist, Dr. Blackman, and has required therapy in order to deal with his grief. Before the accident, he was manager of the store where he was the pharmacist. After the accident, he gave up

his managerial responsibilities and continues only as a pharmacist. He stated his reason for giving up the manager's position was that he could no longer perform those duties due to the effect the loss of his son had on his life.

There was also considerable evidence of the effect of Jeffrey's death on Mrs. Goodove. Prior to the accident, Mrs. Goodove, a realtor, had been a very outgoing person. After the accident, although she continued in her real estate business, she became withdrawn. Her anguish and suffering over the loss of her son was substantially enhanced because of the effect of Jeffrey's death on her husband.

The evidence established that the Goodove family was a closely-knit family. They took family vacations together, attended church together, and assisted one another in times of difficulties. There was testimony that Jeffrey appeared to be the rising star of the family and that this was recognized by all of the family members.

During trial, I had the opportunity to observe the demeanor of each of the witnesses. With regard to Mr. and Mrs. Goodove, it was clear to me that the loss of their son, Jeffrey, has caused and will continue to cause them significant anguish and sorrow. The testimony of the witnesses on how Jeffrey's loss affected his parents was presented in a very credible fashion.

With regard to the effect of Jeffrey's death on his brothers, Michael and Scott, the evidence, though no less credible, was that it was substantially different from that of the effect on Mr. and Mrs. Goodove. While greatly saddened by his death, the evidence was the impact of Jeffrey's death on them was to a lesser degree than on Jeffrey's parents. This should not be surprising. The evidence was that Mr. and Mrs. Goodove were loving and devoted parents dedicated to their children such that their lives revolved around their children rather than themselves. The enormity of the loss of their middle child in whom they had great hopes and aspirations was clearly observable at trial. Again, while not in any way diminishing the sorrow and loss felt by Michael and Scott, their loss, based on the evidence presented, was not comparable to the loss felt by the parents.

*Defendants' Request for a New Trial or in the
Alternative for the Plaintiff to Accept the Remittitur*

Pursuant to Va. Code §§ 8.01-383 and 8.01-383.1, the defendants have requested that the jury verdict be set aside or, in the alternative, that the plaintiffs be required to accept a remittitur. There are three grounds for the motion. The first is that the court erred in permitting plaintiffs' counsel to mention specific amounts to the jury for each statutory beneficiary during his summation. The second is that the verdict form on which the jury returned its verdict did not include a specific line on which the total amount of the damage award to the plaintiffs would be entered in conjunction with the jury distributing the verdict among the four beneficiaries. The third is that the verdict is excessive.

The motion to set aside the verdict on the ground the plaintiffs' attorney was permitted to present a specific amount for each statutory beneficiary for the jury to consider is denied. In 1988, the legislature enacted Section 8.01-379.1, which permits the attorney for either party in a civil action to inform the jury of the amount of damages "sought by the plaintiff" and that reference to this amount could be in the opening statement or closing argument. Here, the attorney for the plaintiffs in his summation requested $500,000.00 each for Mr. and Mrs. Goodove, the decedent's parents, and $500,000.00 each for Michael and Scott, the decedent's brothers.

Specific awards for statutory beneficiaries are part and parcel of a wrongful death action. Va. Code Section 8.01-54 permits a party to have a jury instructed that one of its functions if it finds for the plaintiff is to specifically distribute any award among the statutory beneficiaries. To accept the defendants' argument is to construe §§ 8.01-54 and 8.01-379 in an illogical way. It would permit plaintiffs' attorney in his summation to request the jury to award $2,000,000.00 to be apportioned equally between the statutory beneficiaries but not ask for individual specific $500,000.00 awards for the same four beneficiaries. I do not believe this was the intent of the legislature. The defendants' motion to dismiss on this ground is denied.

The second ground relates to the verdict form and the fact that it did not include a line or entry on which the jury would state the total amount of its award to the plaintiffs, the co-administrators of the decedent's estate. In this case, the co-administrators were Mr. and Mrs. Goodove, two of the four eligible statutory beneficiaries. I believe the instructions need not include such a line so long as the verdict form allows the jury to render a verdict within the statutory framework. I have reviewed my notes and do not find that an objection was made to the verdict form as submitted by the plaintiffs and approved by the court. An objection to the verdict form not having been made at trial, I cannot now consider this as a ground for a new trial.

The third basis on which to set aside the verdict is that the verdict is excessive. This ground has given the court the most difficulty.

The role of a trial court in considering whether to set aside a jury verdict as excessive has been the subject of several recent Virginia Supreme Court decisions. *Smithey v. Refining Co.*, 203 Va. 142, 146 (1961); *Hogan v. Carter & Grinstead*, 226 Va. 361, 372 (1983); *The Gazette v. Harris*, 229 Va. 1, 48 (1985); *Modaber v. Kelly*, 232 Va. 60, 69 (1986); *Robertson v. Old Dominion Freight Line*, 236 Va. 125, 129 (1988); *Johnson, Adm'r v. Smith*, 241 Va. 396 (1991). The salient points for this court to consider are set forth in *Smithey v. Refining Co.*:

> In a case where the verdict of a jury is attacked on the ground that it is excessive, the rule controlling the actions of the court in relation thereto are clear and well-defined. If the verdict merely appears to be large and more than the trial judge would have awarded had he been a member of the jury, it ought not to be disturbed, for to do so the judge must then do what he may not legally do, that is, substitute his judgment for that of the jury.
>
> But if it appears that the verdict is so excessive as to shock the conscience of the court and to create the impression that the jury has been influenced by passion, corruption or prejudice, or has misconceived or misunderstood

the facts of law, or if the award is so out of proportion to the injuries suffered to suggest that it is not the product of a fair and impartial decision, then it becomes the plain duty of the judge, acting within his legal authority to correct the injustice.

Each case must be judged on its own merits, according to its own peculiar facts and circumstances. What is fair in one case might be entirely inadequate or grossly excessive in another. If the size of the verdict bears no reasonable relation to the damages disclosed by the evidence, it is manifestly unfair. If a standard to measure the damages is lacking, we must depend upon the trial judge to use his sense of justice and fairness, sometimes aided by the "average verdict rule," to correct the unfairness.

*Smithey*, 203 Va. at 146-147. (Citations omitted.)

Applying those principles here, it is my conclusion that the evidence supports the jury's award of $200,000.00 each to Mr. and Mrs. Goodove. On the other hand, it is my conclusion that the award of $200,000.00 each to Michael and to Scott is excessive. The awards to Michael and Scott are, in my view, so out of proportion to the evidence of the injury suffered by them that I do not believe they are the "product of a fair and impartial decision." *Smithey, supra*, 203 Va. at 146.

In making this decision, I reviewed the evidence and, to the best of my ability, refrained from substituting my judgment for that of the jury as to what a reasonable verdict would be with regard to the injury suffered by Michael and Scott Goodove. The evidence as to the degree of the loss to Mr. and Mrs. Goodove was substantial. I do not intend to review that evidence as I have discussed it previously in this letter. Again, while I do not diminish the loss to either Michael or Scott Goodove, a $200,000.00 award to each for their sorrow, mental anguish, loss of solace and reasonably expected loss of services, protection, care and assistance is out of proportion to the evidence presented at trial. Simply put, the evidence as to their sorrow, anguish and loss of solace, while perhaps no less

real to them, did not in any way compare to the evidence of the parents' sorrow and anguish.

My responsibility under §§ 8.01-383 and 8.01-383.1, is to "take action to correct what plainly appears to be an unfair verdict." *Smithey*, 203 Va. at 146. It is my conclusion that this case requires a remittitur of a portion of the jury's award of damages to Michael and Scott Goodove. The remittitur that I order pursuant to Section 8.01-383.1, is that their two awards be reduced each by the sum of $125,000.00, resulting in a total award to the plaintiffs of $550,000.00, plus $7,120.26 for funeral and medical expenses.

The plaintiffs shall notify the court within fourteen days of the receipt of this letter whether they accept this remittitur and a judgment for the reduced sum or accept a new trial on the issue of damages. Should the plaintiffs elect to have a new trial on the issue of damages, the court would require that the damage claims for all four beneficiaries be presented at the retrial as I do not see how it is practical to have a new trial on the issue of damages solely limited to those suffered by Michael and Scott Goodove.